UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CONAX FLORIDA CORP.,

       Plaintiff,

v.                             CASE No. 8:07-CV-76-T-TGW

ASTRIUM LTD.,

       Defendant.

_____

O R D E R

THIS CAUSE came on to be heard upon the defendant's Motion to Quash Service of Process and to Dismiss for Lack of Personal Jurisdiction or Alternative Motion to Stay Proceedings and Compel Arbitration (Doc. 4), the plaintiff's response (Doc. 7), and the defendant's reply (Doc. 13). Because the plaintiff properly served process upon the defendant, and the defendant had sufficient contacts with Florida to satisfy Florida's long-arm statute and constitutional due process requirements, the defendant's request to quash service of process and to dismiss for lack of personal jurisdiction will be denied. However, based on an arbitration provision in the parties' contract

which makes arbitration mandatory under these circumstances, the alternative request to stay these proceedings and compel arbitration will be granted.

I.

The plaintiff, Conax Florida Corporation, is headquartered in St. Petersburg, Florida.  It specializes in the design and manufacture of pyrotechnic valves ("pyrovalves") that are used in satellites.[1]  Defendant Astrium Limited  is an English company with its principal place of business in the United Kingdom.  It builds and maintains satellites for civil and military communications.

In 2000, the defendant contacted the plaintiff regarding the purchase of pyrovalves for its Eurostar 3000 commercial telecommunication satellites (Guenthardt Aff., Doc. 7-2, ¶8).  The parties had previously developed a relationship when the defendant purchased from the plaintiff pyrovalves for its aerospace industry satellites (id. at ¶¶ 6, 7).

On July 24, 2000, the defendant gave the plaintiff in Florida an Authorization to Proceed and work order to manufacture pyrovalves for its

---

[1]Pyrovalves are an essential element of a satellite's propulsion system (Guenthardt Aff., ¶5).  They are electro-explosively actuated devices that are used to isolate key segments of the satellite's propulsion system until needed.

Eurostar 3000 satellites (id. at ¶9; Doc. 7-5, Ex. 2).  In March 2001, the defendant sent a team of  employees to the plaintiff's facility in Florida in order to advance from the work authorization to the final contract (Guenthardt Aff., ¶10). The parties reached in Florida an oral agreement, which was subsequently placed in writing and signed by the defendant in England (id. at ¶¶ 11, 12).[2] The parties' Subcontract for Pyrotechnic Valves ("Subcontract") (Doc. 4-2) was then executed by the plaintiff in Florida (Guenthardt Aff., ¶12).

The defendant agreed to purchase from the plaintiff 406 pyrovalves, which were to be manufactured in four batches between April 2001 and June 2005 (Kovacik Aff., Doc. 7-7, Ex. B, ¶11).  The Subcontract afforded the defendant full access to the plaintiff's facilities in order to observe, inspect, examine, and evaluate the plaintiff's work (Doc. 4-2, Art. 14, §14.1(a)).[3] The Subcontract further specified that the defendant had "the

---

[2]The defendant submitted the declaration of Robert Swain, who stated that the commercial terms of the contract were not negotiated in Florida (Doc. 13-5, Ex. 3, ¶4).  It is noted, however, that the commercial terms are only one aspect of the Subcontract, which is comprised of thirty-eight Articles and several Annexes (see Subcontract, Doc. 4-4, Table of Contents).

[3]"'Work' means all design, development, construction, manufacturing, labour services and acts, including tests, to be performed and any and all Deliverable Items,

right to participate in or execute surveys, audits, reviews, source inspections, test observations, mandatory inspections and any other activity in pursuance of the terms of this Subcontract or have itinerant personnel" at the plaintiff's facilities (id. at §14.7).  It also provided the defendant's representatives with office space and facilities when they were in Florida (Doc. 4-5, Art. 11, §11.12; see also Guenthardt Aff., ¶13).

Accordingly, approximately every other month throughout the term of the Subcontract the defendant's representatives traveled to the plaintiff's facility in St. Petersburg, Florida, to oversee the manufacturing and testing of the pyrovalves (Kovacik Aff., ¶¶ 12-14; Guenthardt Aff.,¶13). Additionally, the defendant brought its customers to Florida to tour the plaintiff's facility (Kovacik Aff., ¶12).

By June 2005, three of the four batches of pyrovalves had been manufactured and successfully tested.  However, on June 28, and June 29, 2005, during the testing of the fourth batch of pyrovalves, both parties observed cracking in the valves (Guenthardt Aff., ¶15; Kovacik Aff., ¶16). Additionally, further examination of earlier batches of pyrovalves also

---

materials, articles, matters, information, services and things to be furnished and rights to be transferred under this Subcontract" (Subcontract, Doc. 4-4, Art. 1, Definitions).

showed cracking (Kovacik Aff., ¶16).  The defendant's representatives subsequently visited the plaintiff's facility several times to investigate with the plaintiff the cause of the cracking (Guenthardt Aff., ¶¶ 15, 17; Kovacik Aff., ¶¶ 17-21).

Thereafter, a dispute arose regarding the scope of the plaintiff's liability under the contract for the nonconforming pyrovalves (see Guenthardt Aff., ¶22).  Thus, in October 2005, the defendant claimed damages of approximately 24.5 million euros (which is in excess of thirty million United States dollars) (id. at ¶19).  The plaintiff argues that this demand is excessive and is unrelated to the measure of damages contemplated in the Subcontract.

With regard to disputes, the Subcontract provides (Doc. 4-3, Art. 20, §20.2):

> In the event of any dispute arising out of the terms of this Subcontract, the Parties shall undertake to make every reasonable effort to reach an amicable settlement.  Failing such settlement, a controversy or claim arising out of or relating to this Subcontract may be finally settled by arbitration in accordance with the rules then in effect of the International Chamber of Commerce.

After the parties investigated liability, they communicated on settlement issues, without success.  The parties subsequently agreed to mediate this dispute on December 15, 2006, in Florida (Giobbe Dec., Doc. 4-8, ¶5).

On December 12, 2006, Francesco P. Giobbe, defendant's counsel, traveled from France to Tampa to attend the mediation conference (id. at ¶7).  The parties attended the mediation, but it ended in an impasse.

At the conclusion of the mediation, the mediator advised defense counsel to remain in the conference room (id. at ¶12).  Thereafter, plaintiff's counsel entered the room with a process server and gave Giobbe a copy of the summons and complaint filed in this case (id. at ¶13).[4]  Unbeknownst to the defendant, the plaintiff had filed this lawsuit in Pinellas County Circuit Court the previous day, December 14, 2006 (Doc. 4-6).

The plaintiff's complaint concedes that its pyrovalves failed, but it disputes the scope of its liability (Doc. 2, p. 4).  The plaintiff seeks a declaratory judgment that its liability for the failed pyrovalves does not extend

---

[4]Additionally, the plaintiff sent a copy of the summons and complaint to Florida's Secretary of State, the defendant's United States counsel, and the defendant's office in the United Kingdom (see Doc. 7-7, p. 14).

beyond their repair, replacement, or a refund to the defendant of the amount received by the plaintiff for the nonconforming valves (id. at p. 3).

After removing this lawsuit from state court (Doc. 1), the defendant filed its Motion to Quash Service of Process and to Dismiss for Lack of Personal Jurisdiction, or Alternative Motion to Stay Proceedings and Compel Arbitration (Doc. 4).  The plaintiff submitted an opposition to this motion (Doc. 7).  The defendant was permitted to file a reply (Doc. 13).  Oral argument on the motion was subsequently conducted (Doc. 26).

## II.

The defendant argues that the case should be dismissed pursuant to Rule 12(b)(5), Fed.R.Civ.P., for insufficient service of process (Doc. 4, pp. 6-10).  The plaintiff contends that it properly effected personal service of process upon the defendant pursuant to §48.031, Fla. Stat., and substitute service under §§ 48.161 and 48.181, Fla. Stat. (Doc. 7, pp. 5-11).

A.  Under §48.031(1)(a), Fla. Stat., a party may effectuate service of process by "delivering a copy of it to the person to be served with a copy of the complaint, petition, or other initial pleading or paper...."  The plaintiff contends that it complied with this provision when it served Giobbe, the

defendant's corporate representative, in Tampa on December 15, 2006, following the failed mediation (Doc. 7, pp. 5-8).

The defendant argues that the plaintiff's service of process upon Giobbe is insufficient because the plaintiff accomplished service by luring him into Florida under the guise of settlement negotiations, which is a tactic prohibited by Florida law (Doc. 4, p. 6). Thus, in Citrexsa, S.A. v. Landsman, 528 So.2d 517 (Fla. App. 1988), service of process was quashed after the defendants, who traveled from Mexico to Florida to attend a settlement conference, were served with process prior to the mediation. The court found that the plaintiffs' conduct demonstrated that they "never intended to participate in good faith settlement negotiations, and that their agreement to participate in the settlement conference was merely an artifice to serve" the defendants. Id. at 518; see also Mallin v. Sunshine Kitchens, Inc., 314 So.2d 203 (Fla. App. 1975), cert. denied, 330 So.2d 22 (Fla. 1976).

Emphasizing the plaintiff's filing of the lawsuit the day prior to the mediation, the defendant claims that service of process in this case should be quashed because, "like the plaintiffs in Citrexsa, S.A. and Mallin, [the plaintiff] conned [the defendant] into traveling to Florida under the pretense

of settlement," when its true intention was to serve the complaint (Doc. 4, p. 7).  The plaintiff denies the defendant's allegation, contending, among other things, that its good faith participation in the mediation is evidenced by the attendance of its three most senior officers and the several hours they spent attempting to resolve the disagreement (Guenthardt Aff., ¶24).[5]

In sum, there is a substantial dispute as to whether the plaintiff's actions in effecting personal service of process constitute bad faith.  Its resolution would require an evidentiary hearing involving the disturbing circumstance of testimony from the lawyers involved in the mediation process.[6]  However, this issue need not be resolved and, therefore, no evidentiary hearing is necessary, because, as discussed below, the plaintiff properly effected substitute service upon the defendant pursuant to §§ 48.161 and 48.181, Fla. Stat.

---

[5]Giobbe, on the other hand, claims that the mediation "lasted a short period of time" (Giobbe Dec., ¶¶ 10-11).

[6]The defendant suggests that this matter can be immediately resolved by following the approach in Kmart Corp.  v. Gen-Star Ind. Co., Ltd., 110 F.R.D. 310, 313 (E.D. Mich. 1986)(emphasis omitted), which places "a flat prohibition on service ... unless the plaintiff warns the defendant before he enters the jurisdiction that he may subject himself to process, or else when settlement talks fail the plaintiff must give the defendant an opportunity to leave the jurisdiction before service is made."  That, however, is not the governing law established in Florida in Citrexsa, S.A. v. Landsman, supra, and Mallin v. Sunshine Kitchens, Inc., supra.

B.   The plaintiff contends that it effected service upon the defendant in accordance with §§ 48.161 and 48.181, Fla. Stat. (Doc. 7, p. 9). In this regard, it explains (id. at p. 10, n.6):

> Three copies of process ... were mailed certified mail, return receipt requested, as required, to the Secretary of State.  A notice of service and a copy of the process were sent both to a company representative at [the defendant's] registered office in the United Kingdom and to its U.S. Attorney by certified mail, return receipt requested.

The defendant does not dispute that it received a copy of the summons and complaint through the mail (see Doc. 13, pp. 4-5).  Rather, it argues that service of process by mail is not authorized by The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("The Hague Convention"), which governs international service of judicial documents.   20 U.S.T. 361, T.I.A.S. No. 6638 (reprinted in 28 U.S.C.A., Fed.R.Civ.P. 4 (2007 Supp., note at p. 129)).

Article 10(a) of the Hague Convention specifies that the Convention shall not interfere with "the freedom to send judicial documents by postal channels directly to persons abroad" if the state of destination does not object.  Since the United Kingdom has not objected to Article 10(a), see

U.S. Dept. of State, Judicial Assistance in the United Kingdom, http://travel.state.gov./law/info/judicial, the plaintiff contends that service of process by mail pursuant to §§ 48.161 and 48.181, Fla. Stat., is not inconsistent with the Hague Convention's requirements (Doc. 7, p. 11). However, the defendant argues that the plaintiff's reliance on Article 10(a) is misplaced because Article 10(a) applies only to documents sent *after* service of process is effected (Doc. 13, pp. 4-5).

The crux of this issue is whether "freedom to send judicial documents" includes service of process. This is a matter on which federal courts disagree. One line of cases holds that the phrase "send judicial documents" does not include "service of process," but rather encompasses documents sent only after service of process is effected. See Nuovo Pignone, SpA v. Storman Asia M/V, 310 F.3d 374, 384 (5th Cir. 2002); Bankston v. Toyota Motor Corp., 889 F.2d 172, 174 (8th Cir. 1989). These courts hold that, if Article 10(a) were intended to permit an additional method of process service, the word "service," as it is used liberally in other provisions, would have been chosen instead of "send." Id.

On the other hand, several federal courts hold that Article 10(a) does include service of process by mail, reasoning that "send judicial documents" encompasses "service of process." Brockmeyer v. May, 383 F.3d 798, 802 (9th Cir. 2004); Ackermann v. Levine, 788 F.2d 830, 838-40 (2nd Cir. 1986); Research Systems Corp. v. IPSOS Publicite, 276 F.3d 914, 926 (7th Cir. 2001), cert. denied, 537 U.S. 878 (2002).

As discussed in Brockmeyer, service of process by mail "is consistent with the purpose of the Convention to facilitate international service of judicial documents." Brockmeyer v. May, supra, 383 F.3d at 802. Further, this interpretation is shared by commentaries, including the official report of the Hague Convention. See, e.g., 1 B. Ristau, International Judicial Assistance (Civil and Commercial) §4-3-5 (1984); see Brockmeyer v. May, supra, 383 F.3d at 802-03 (listing historical documents).

In particular, the United States Government, through the State Department, wrote a letter to the Administrative Office of the United States Courts on this issue, stating, in pertinent part (Letter from Alan J. Kreczko, U.S. Dep't. of State Deputy Legal Advisor to the Admin. Office of the U.S. Courts (March 14, 1991)):

> We ... believe that the decision of the Court of
> Appeals in <u>Bankston</u> is incorrect to the extent that
> it suggests that the Hague Convention does not
> permit as a method of service of process the
> sending of a copy of a summons and complaint by
> registered mail to a defendant in a foreign country.

In addition, this position is shared by several other member countries of the Hague Convention.  <u>Brockmeyer</u> v. <u>May</u>, <u>supra</u>, 383 F.3d at 802.

I find more persuasive those decisions, particularly <u>Brockmeyer</u>, that hold that Article 10(a) is applicable to service of process.  Therefore, consistent with those decisions construing Article 10(a) of the Hague Convention to permit service of process by mail if the state law provides such an option, and the receiving country does not object, I find that the plaintiff's service of process upon the defendant in accordance with §§ 48.161 and 48.181, Fla. Stat., does not violate the Hague Convention.  Notably, the defendant does not contend that the plaintiff failed to comply with those provisions of Florida law.  Accordingly, the plaintiff has properly effected service of process upon the defendant.

III.

The defendant argues further that, even if service of process is effective, this case should be dismissed for lack of personal jurisdiction (Doc. 4, pp. 10-13).

In order to establish personal jurisdiction over a non-resident defendant, a plaintiff must show, first, that jurisdiction is authorized by statute, and, second, that the exercise of jurisdiction is consistent with due process. International Shoe Co. v. Washington, 326 U.S. 310 (1945); Sun Bank, N.A. v. E.F. Hutton & Co., Inc., 926 F.2d 1030, 1033 (11th Cir. 1991).

Initially, these requirements may be satisfied simply by allegations in the complaint that are sufficient to make out a prima facie case of jurisdiction. Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1214 (11th Cir. 1999). However, if the defendant challenges the jurisdictional allegations by affidavit, the plaintiff bears the burden of proving by affidavit or other evidence that the court has jurisdiction over the defendant. Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 627 (11th Cir. 1996). To the extent that the parties' affidavits conflict, all reasonable inferences are to be made in favor of the plaintiff. Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 855 (11th Cir. 1990).

In order to satisfy the first prong of this analysis, the plaintiff relies upon the provision of Florida's long-arm statute that states, in pertinent part (§48.193(1)(a), Fla. Stat.):

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself ... to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

> (a) Operating, conducting, or engaging in, or carrying on a business or business venture in this state or having an office or agency in this state...

The defendant argues that it is not subject to jurisdiction under this statute because it did not engage in business in Florida (Hussain Dec., Doc. 4-7). Thus, it states that it is an English company that does not maintain any offices or own any property in Florida (id. at ¶¶ 5, 6). Further, the defendant avers that it does not have any employees in Florida or advertise its business in Florida (id. at ¶¶ 7-10).

Moreover, the defendant contends that its contract to purchase pyrovalves from the plaintiff is insufficient to confer personal jurisdiction because "the mere purchase of goods" from a Florida corporation does not

constitute doing business in Florida (Doc. 4, p. 12)(citing Bruzzone Roldos v. Americargo Lines, Inc., 698 So.2d 1368, 1369-70 (Fla. App. 1997)).

In order to establish that a defendant is carrying on a business for the purposes of Florida's long-arm statute, the activities of the defendant must be considered collectively and must show a general course of business activity in the state for pecuniary benefit. Sculptchair, Inc. v. Century Arts, Ltd., supra, 94 F.3d at 627. Contrary to the defendant's argument, this case does not involve the mere purchase of goods.

Here, the defendant collaborated with the plaintiff, a Florida company, in the production of pyrovalves, a critical component of its Eurostar 3000 satellites.[7] In this connection, the defendant traveled to Florida to negotiate important contract terms and thereafter traveled to Florida numerous times to oversee the manufacturing process and to participate in the testing of the pyrovalves. Further, the defendant brought its clients to Florida to showcase the design and production of the pyrovalves. Moreover, it traveled

---

[7]The parties dispute whether the parties collaborated on the design of the pyrovalves (compare Kovacik Aff., ¶¶ 8-9 with Hussain Supp. Dec., Doc. 13-2, ¶¶ 4, 5). The evidence suggests that the design and specifications of the pyrovalves were, at least, discussed by the parties (see Kovacik Aff., ¶¶ 8, 9, 10, 12). Regardless, the defendant's undisputed activities show substantial connections to Florida.

to Florida to investigate with the plaintiff the cause of the cracking in the pyrovalves.  In all, the defendant traveled to Florida in connection with this contract more than twenty times (Guenthardt Aff., ¶13).

There are additional factors showing that the defendant engaged in a business venture in this state.  Thus, the defendant had previously contracted with the plaintiff's Florida company for the purchase of pyrovalves (id. at ¶¶ 6, 7).  And, with regard to this Subcontract, the defendant bargained for significant oversight of the manufacturing process in Florida, including a provision that required the plaintiff to provide it office space and related facilities in Florida (Doc. 4-5, Art. 11, §11.12).

Therefore, when viewed cumulatively, the defendant's activities demonstrate that it engaged in business in the state for pecuniary benefit.  This activity satisfies §48.193(1)(a), Fla. Stat.  Sculptchair, Inc. v. Century Arts, Ltd., supra.

B.    The second prong of the jurisdictional issue, the constitutional inquiry, is twofold.  First, the defendant must have established such "minimum contacts" with the forum state that the defendant "should reasonably anticipate being haled into court there." World-Wide Volkswagen

Corp. v. Woodson,  444 U.S. 286, 297 (1980).  Second, the contacts must be considered along with other factors to determine whether the assertion of jurisdiction comports with the principles of "fair play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985).

Establishing minimum contacts in the forum state is the constitutional touchstone.  In this regard, the Supreme Court has explained that a forum may exercise specific jurisdiction over a nonresident defendant if it "has purposefully directed [its] activities to forum residents and the resulting litigation derives from alleged injuries that arise out of or relate to those activities."  Id. at 474.

For example, where, as here, a non-resident corporation engages a Florida corporation "to perform specific services on their behalf and then actively monitor[s] such services ... in the state of Florida .... the non-resident defendants [are] amenable to suit in Florida because they had essentially availed themselves of the privilege of conducting business in Florida." Marsh Supermarkets, Inc. v. The Queen's Flower Corp., 696 So.2d 1207, 1209 (Fla. App. 1997), rev. denied, 705 So.2d 10 (1997); see, e.g., Ben M. Hogan Co., Inc. v. QDA Inv. Corp., 570 So.2d 1349, 1350-51 (Fla. App. 1990); Pellerito

Foods, Inc. v. American Conveyors Corp., 542 So.2d 426 (Fla. App. 1989). Thus, based on the defendant's frequent visits to Florida to exercise oversight of the pyrovalve manufacturing process and to promote its sales objectives, it should reasonably anticipate being haled into court in Florida. Accordingly, the defendant's contacts with Florida clearly meet the constitutional minimum.

Finally, it must be determined whether the exercise of personal jurisdiction over the defendant would transgress traditional notions of fair play and substantial justice. World-Wide Volkswagen Corp. v. Woodson, supra, 444 U.S. at 292. This requires consideration of the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining convenient and effective relief. Id. However, it is noted that, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." Asahi Metal Ind. Co., Ltd. v. Superior Court of California, 480 U.S. 102, 114 (1987).

The defendant has not presented a cogent argument for finding that personal jurisdiction in Florida would be unreasonable. Thus, it

purposefully directed activity to Florida and its representatives repeatedly traveled to Florida in connection with the Subcontract.   Under these circumstances, personal jurisdiction in Florida does not contravene basic notions of fair play and substantial justice.

Further, although the defendant claims that it is an undue burden to defend a lawsuit in Florida, this factor is not particularly compelling because "modern improvements in transportation and communication significantly lessen this hardship." Williams Elec. Co., Inc. v. Honeywell, Inc., 854 F.2d 389, 393 (11th Cir. 1988).   This is exemplified by the defendant's numerous trips to Florida.   Importantly, because the plaintiff is a Florida corporation, the defendant cannot maintain that Florida does not have a significant interest in this dispute. Id.   Consequently, the defendant has failed "to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable given the existence of minimum contacts." Id.

For these reasons, litigation of this lawsuit in Florida would not violate due process.   In fact, however, there will not be any substantial

litigation here because, as will be explained, this lawsuit will be stayed pending arbitration in England.

In sum, the plaintiff has shown that the defendant had sufficient contacts with Florida so that personal jurisdiction in this state satisfies the Florida long-arm statute and constitutional due process concerns. Accordingly, the defendant's motion to dismiss for lack of jurisdiction is without merit.

## IV.

The defendant has alternatively moved for a stay of proceedings in this case and to compel arbitration pursuant to the Federal Arbitration Act ("FAA"). It relies upon the arbitration clause in the parties' agreement which states, in pertinent part (Doc. 4-3, Art. 20, §20.2):

> In the event of any dispute arising out of the terms of this Subcontract, the Parties shall undertake to make every reasonable effort to reach an amicable settlement. Failing such settlement, a controversy or claim arising out of or relating to this Subcontract may be finally settled by arbitration in accordance with the rules then in effect of the International Chamber of Commerce.

. . .

> The location of the arbitration shall be in London, England and the arbitration shall be held in English. Each party shall bear its own expenses in participating in the arbitration process.

Based on this provision, the defendant commenced arbitration proceedings in England (see Doc. 5).  The plaintiff opposes arbitration, arguing that it is optional (Doc. 7).

The parties agree that the FAA governs this matter  (Doc. 4, p. 15; Doc. 7, p. 15).  The FAA manifests a federal policy favoring arbitration and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.  Moses H. Cone Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983).  However, arbitration is not to be imposed on parties who did not agree to it.   EEOC v. Waffle House, Inc., 534 U.S. 279, 289 (2002).

The plaintiff contends that the arbitration provision in this case is optional because the "use of the word 'may'... evinces the parties' intent not to be bound to invoke the arbitration clause ..." (Doc. 7, p. 17).  In other words, the plaintiff argues that, by selecting the word "may," instead of

"shall" or "must," the parties have the option of litigating the dispute if they do not mutually agree to arbitrate.[8]

Contrary to the plaintiff's contention, the word "may" does not give one party the right to avoid arbitration.[9]   See Ziegler v. Knuck, 419 So.2d 818, 819 (Fla. App. 1982)(the use of the word "may" in an arbitration clause "is little different than the use of the compulsory language-it creates in either party the right to insist upon arbitration; it creates in neither party the right to resist arbitration insisted upon by the other."); Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 204 n.1 (1985)("The use of ... 'may' is not sufficient

---

[8]A threshold issue is *who* decides whether the parties agreed to mandatory arbitration.  With regard to this issue, the presumption of arbitrability is reversed; thus, it is an issue for judicial determination unless the parties "clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002); First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995).

The defendant argues that, because the parties agreed to the International Chamber of Commerce rules of arbitration, and those rules provide that the arbitration panel decides questions of arbitrability  (see ICC, Art. 6), there is clear and unmistakable evidence that the parties intended for the arbitrators to make this determination. See  Apollo Computer, Inc. v. Berg, 886 F.2d 469, 473 (1st Cir. 1989); Daiei, Inc. v. U.S. Shoe Corp., 755 F.Supp. 299, 303 (D. Hawaii, 1991).  However, in this case, the word "may" in the arbitration clause makes it unclear whether arbitration is mandated.  Compare with id.  Therefore, it cannot be stated that there is "clear and unmistakable evidence" that the parties agreed to have the arbitration panel decide arbitrability.  Accordingly, the court decides whether the parties agreed to mandatory arbitration.

[9]The issue presented here is one of contract interpretation and, therefore, state law principles apply, but with a generous construction as to issues of arbitrability.  Employers Ins. of Wausau v. Bright Metal Specialties, Inc., 251 F.3d 1316, 1322 (11th Cir. 2001).  Regardless, the guiding legal principles are the same under federal and state law.

to overcome the presumption that parties are not free to avoid the contract's arbitration procedures."); <u>Deaton Truck Line, Inc.</u> v. <u>Local Union 612</u>, 314 F.2d 418, 422 (5th Cir. 1962) ("Clearly, ... 'may' should be construed to give either aggrieved party the option to require arbitration."); <u>see</u> <u>also</u> <u>Webster's Third New Int'l Dictionary</u> (unabridged ed. 1981), p. 1396 ("may" is defined as "shall, must–used esp. in deeds, contracts and statutes").  Thus, the United States Supreme Court, the former Fifth Circuit, and a Florida appellate court have all concluded that, notwithstanding the use of the word "may" in an arbitration provision, either party has a right to insist upon arbitration.[10]

Furthermore, even if the word "may" is thought to create some ambiguity in the arbitration provision, any uncertainty would be overcome by the principle that ambiguities are to be construed in favor of arbitration. <u>Mastrobuono</u> v. <u>Shearson Lehman Hutton, Inc.</u>, 514 U.S. 52, 62 (1995); <u>AT&T Technologies, Inc.</u> v. <u>Communications Workers of America</u>, 475 U.S. 643, 650 (1986)( "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause

---

[10]The plaintiff's citation to Florida forum-selection clause cases, which construe "may" as permissive, are not applicable because, among other things, the presumption in favor of arbitrability does not apply.  Similarly, the Florida case cited by the plaintiff that involves an arbitration clause contains no analysis and lacks acknowledgment of the policy favoring arbitration. <u>See</u> <u>Young</u> v. <u>Dharamdass</u>, 695 So.2d 828 (Fla. App. 1997).

is not susceptible of an interpretation that covers the asserted dispute."); <u>see also</u> <u>Hirshenson</u> v. <u>Spaccio</u>, 800 So.2d 670, 674 (Fla. App. 2001) ("'Arbitration clauses are to be given the broadest possible interpretation in order to accomplish the purpose of resolving controversies outside of the courts.'"). Therefore, any ambiguity created by the word "may" is properly construed in favor of arbitration. <u>See</u>, <u>e.g.</u>, <u>Ceres Marine Terminals, Inc.</u> v. <u>Int'l Longshoreman's Ass'n, Local 1969, AFL-CIO</u>, 683 F.2d 242, 247-48 (7th Cir. 1982).

Moreover, this is unquestionably the more reasonable and plausible construction of the parties' intent. Thus, the plaintiff's interpretation impermissibly renders the arbitration provision illusory, as the parties can always agree to arbitrate in the absence of a contractual provision. <u>Austin</u> v. <u>Owens-Brockway Glass Container, Inc.</u>, 78 F.3d 875, 879 (4th Cir. 1996), <u>cert</u>. <u>denied</u>, 519 U.S. 980 (1996); <u>American Italian Pasta Co.</u> v. <u>Austin Co.</u>, 914 F.2d 1103, 1104 (8th Cir. 1990); <u>see also</u> <u>Maguire</u> v. <u>King</u>, 917 So.2d 263, 266 (Fla. App. 2005)(give reasonable meaning to all terms of the arbitration provision in order to avoid rendering part of the contract "toothless"). Further, the agreement to have English law govern the contract is more

consistent with arbitration of disputes in England than litigation in the United States.  <u>See</u> Doc. 4-3, Art. 20, §20.1 ("This Subcontract shall be interpreted, governed and construed in accordance with the laws of England").

Significantly, an e-mail from the plaintiff to the defendant unequivocally states that "[a]rbitration in London is acceptable" (Doc. 13-6, Ex. A).  This provides confirmation of the parties' intent to arbitrate disputes arising from this contract.

In sum, the arbitration provision creates the right of a party to submit the matter for arbitration.  As a result, the defendant has initiated arbitration proceedings in England pursuant to the terms of the agreement (<u>see</u> Doc. 5, Ex. 1).  Accordingly, this court proceeding will be stayed and the parties ordered to proceed with arbitration in England.

Therefore, for the foregoing reasons, it is

ORDERED:

That the defendant's Motion to Quash Service of Process and to Dismiss for Lack of Personal Jurisdiction, or Alternative Motion to Stay Proceedings and Compel Arbitration (Doc. 4) is hereby **GRANTED** to the

extent that the case is **STAYED,** and the parties are directed to proceed with

arbitration in England.  In all other respects, it is hereby **DENIED**.

DONE and ORDERED at Tampa, Florida, this 18th day of July,

2007.

_____
THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE